UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DANA McCARRICK,

                     Plaintiff,            Case # 18-CV-6435-FPG

v.

                                      DECISION AND ORDER

CORNING, INC.,

                     Defendant.

## INTRODUCTION

Plaintiff Dana McCarrick brings this action for retaliation under the Americans with Disabilities Act ("the ADA").   The Court previously granted Defendant Corning Inc.'s ("Defendant") motion to dismiss Plaintiff's ADA discrimination claim, Family Medical Leave Act retaliation claim, New York State Human Rights Law ("NYSHRL") discrimination claim, and NYSHRL retaliation claim.  ECF No. 27 at 3-7.  Presently before the Court is Defendant's motion for summary judgment on Plaintiff's ADA retaliation claim.   For the reasons that follow, Defendant's motion is GRANTED.

## BACKGROUND

The following facts are undisputed unless otherwise noted.  Where disputed, the facts are taken in the light most favorable to Plaintiff.[1] Defendant hired Plaintiff as an engineering technician in its Manufacturing, Technology, and Engineering organization in July 2011.  ECF

---

[1] Among the evidence proffered by Plaintiff are two audio recordings.  "Although on summary judgment the evidence must be viewed in the light most favorable to Plaintiff[ ] as the non-moving part[y], when there is reliable objective evidence—such as a recording—the evidence may speak for itself."  *Marcavage v. City of New York*, 689 F.3d 98, 110 (2d Cir. 2012).  Where there exists "a discrepancy between the parties' versions of the facts and a recording of the incident, a court may rely on an unaltered . . . audio recording."  *Burwell v. Peyton*, 131 F. Supp. 3d 268, 293 (D. Vt. 2015).  The Court permitted Plaintiff to submit these recordings after the close of briefing due to his *pro se* status and because his response to Defendant's summary judgment motion stated, "I wanted to make sure the recordings have been submitted as evidence in the case?  The recordings should have been forwarded from NYSDHR with all the evidence in 2017."  ECF No. 55 at 21.  The audio recordings are on file with the Court and the Court has considered them in the facts below.

No. 52-15 at 1; ECF No. 52-16 at 2.  During the course of Plaintiff's employment, he was removed from "numerous projects" by Defendant's management due to his behavior.  ECF No. 52-10 at 2.  For example, in May 2016 he was removed from a project at a customer's request due to his behavior "and his failure to meet the customer's expectations."  *Id.*

In August 2016, Defendant's Human Resource Manager, Stacie VanSkiver, investigated an allegation that Plaintiff "consum[ed] several alcoholic beverages at a dinner while on business travel," and then proceeded to "instigate[ ] an altercation at a hotel with a contractor involved on a Corning project."  ECF No. 52-15 at 2.  According to VanSkiver, the allegation "included verbal confrontation, as well as perceived threats of physical intimidation."  *Id.*

On August 15, 2016, VanSkiver and Plaintiff's then-supervisor, Julie Frey, issued Plaintiff a "Documented Warning."  ECF No. 52-21 at 2.  The Documented Warning indicated that an "investigation ha[d] determined that [Plaintiff's] behaviors that evening were inconsistent with Corning's values and expectations of our employees."  *Id.*  Further, it indicated that the investigation had (1) "confirmed that [Plaintiff] acted inappropriately by 'snapping' at a colleague . . . [without] any provocation"; (2) found Plaintiff "made comments perceived to be threatening"; (3) found Plaintiff "admitted to partaking in multiple alcoholic beverages leading up to this incident"; and (4) determined that Plaintiff  "[did] not recall" making the statements in question.  *Id.*  The Documented Warning also noted that "this [was] not the first time that [Plaintiff] [had] been spoken to in regards to inappropriate emotional and/or verbal responses."  *Id.*  Finally, it included a reminder regarding Defendant's code of conduct and cautioned Plaintiff that "[t]he next instance of inappropriate behavior, policy violation, or performance issue will result in further discipline up to and including termination of employment."  *Id.*

2

In his deposition testimony, Plaintiff stated that he recalled having a meeting with Frey about the Documented Warning and that VanStriker "could have been there."  ECF No. 52-9 at 26.  Plaintiff does not dispute that he received the Documented Warning but testified that he "didn't even look at the document" and that he refused to sign it at the end of the meeting.  *Id.* at 26-27.

In January 2017, one of Defendant's customers removed Plaintiff from a project for not meeting expectations.  ECF No. 52-1- at 2-3.  Plaintiff acknowledged at his deposition that he remembered this removal.  ECF No. 52-9 at 37.  That same month, Plaintiff received a performance review from Frey.  Though the performance review ultimately concluded that he "Fully Met Expectations," and gave him a 3.00 on a scale of 5.00, it noted that Plaintiff "had a very challenging year in 2016," that he "struggled this year on multiple projects which is reflected in his customer feedback," and that "[c]ustomers . . . indicated that in some instances, [Plaintiff] did not meet their expectations."  ECF No. 52-23 at 6.  Plaintiff asserts that the participants in his review were chosen in a calculated manner and that "the negative remarks were constructed by his supervisor's [sic] just as his termination was constructed."  ECF No. 55 at 2.  He also asserts that Monica Rodrigues-Brown, Defendant's Director of Process Engineering, placed certain coworkers on projects with Plaintiff so "that they could enter negative comments into [his] yearly review" and that those individuals were later "chosen and awarded by promotions."  ECF No. 55 at 4; ECF No. 52-22 at 1.  Plaintiff's response to Defendant's summary judgment motion does not attach evidence supporting these assertions.  *See generally* ECF No. 55.

In May 2017, Matt Kempton became Plaintiff's direct supervisor.  ECF No. 52-24 at 5.  Around that same time in the spring of 2017, one of Plaintiff's project leaders "asked for him to be removed from a project due to his inappropriate behavior and failure to meet expectations."  ECF No. 52-10 at 3.  On June 8, 2017, Kempton placed Plaintiff "on a Performance to Standard

Plan" due to his "history of inappropriate behavior and poor performance." *Id.* The Performance Standard Plan noted that Plaintiff was "still not satisfactorily meeting and sustaining . . . performance expectations" and that Plaintiff was being placed on the Plan beginning immediately for a 90-day period. ECF No. 52-11 at 2. During that time period, Kempton "want[ed] to meet with [Plaintiff] frequently . . . with the focus of improving, so we can move past the performance issues outlined." *Id.* The Plan provided Plaintiff with a chart of targeted areas in which he should seek to improve. *Id.* at 4. It also noted that "[i]nability to meet these standards will result in the loss of your current position or termination." *Id.* at 5. Plaintiff signed the Plan and dated the form June 8, 2017. With respect to the Plan, Plaintiff asserts that Kempton told him "that he was doing great and that he'd be out from underneath the performance [i]mprovement cloud in no time." ECF No. 55 at 4. Plaintiff submitted an audio recording of a conversation with Kempton during which, he asserts, Kempton "threat[ened] me to sign the Performance [I]mprovement [P]lan. The recording is largely indiscernible and the Court could not decipher any threat.[2]

On June 8, 2017, Kempton traveled with Plaintiff on a business trip and observed "inappropriate and unprofessional behavior . . . throughout the trip." ECF No. 52-10 at 3. The conduct noted by Kempton in his affidavit includes Plaintiff commenting on a woman's body parts at the airport, bragging to Kempton about sexual encounters with women, consuming alcohol resulting in belligerent behavior, and cursing loudly during conversations in public. *Id.* at 4. Plaintiff does not directly dispute Kempton's account but indicates that he does not recall making "a derogatory remark about a female . . . but, if [he] did say anything it was a complimentary remark." ECF No. 55 at 4.

---

[2] Even assuming Kempton did threaten Plaintiff to sign the Plan, that issue is immaterial to the dispositive question below: *i.e.*, whether there was a causal connection between the protected activity and the adverse employment action. *See infra* Part II.

After returning from the trip, Kempton concluded that Plaintiff "was unlikely to improve his behavior and decided that [he] should be terminated . . . due to his continued and persistent inappropriate behavior." *Id.* at 5.  On June 22, 2017, Kempton met with his supervisor, Rodrigues-Brown, and VanSkiver to discuss Plaintiff's termination.  *Id.*  The three agreed that Plaintiff would be terminated the following week.  *Id.*

A few days later, on Sunday, June 25, 2017, Plaintiff called Kempton's cell phone and informed him "that he had injured himself at a rock concert."  ECF No. 52-10 at 5.  Plaintiff "severely dislocated his right elbow out of the socket." ECF No. 55 at 3.  Plaintiff sought medical treatment and provided Kempton with a note from his medical provider which excused him from work. ECF. No. 52-24 at 8.  That note, dated June 26, 2017, indicated that Plaintiff "may return to work, desk work only with no lifting on [June 29, 2017]." ECF No. 52-12 at 2.

Plaintiff requested, and was granted, additional accrued paid time off until July 5, 2017. ECF No. 52-24 at 9.  Kempton, Rodrigues-Brown, and VanSkiver "decided to wait to inform [P]laintiff of the termination decision upon his return to work so that [they] could inform him of the termination decision in person."  ECF No. 52-10 at 6.  Kempton, Rodrigues-Brown, and VanSkiver each aver in their respective affidavits that they were unaware of Plaintiff's injury when they made the decision to terminate him and that the decision to terminate had been made before the injury even occurred.  ECF No. 52-10 at 6; ECF No. 52-15 at 4; ECF No. 52-22 at 2.

On July 5, 2017, Plaintiff returned to work and met with Kempton and VanSkiver.  ECF No. 52-24 at 9.  The two informed Plaintiff of the decision to terminate his employment and Plaintiff was escorted out of the building.  *Id.*; ECF No. 52-10 at 6.  Plaintiff submitted an audio recording of the meeting.  Much of the recording is difficult to understand.  At the outset, Kempton tells Plaintiff that the decision to end his employment is "final" and "was made at a pretty high

level."  He then says, "I know that that's a normal question and—and—I would ask them same, but I don't think it would be helpful to hash through those," presumably in response to Plaintiff inquiring as to the specific reasons why he was terminated or the specific inappropriate comments he made.

VanSkiver is then heard speaking but what she is saying is indiscernible.  Plaintiff asks a question, but that too is indiscernible.  In response, Kempton says "Yes, in front of some people," to which Plaintiff responds, "I said something inapprop—last night things were going great, the project was going great."  The recording is then indiscernible once again, but it sounds like VanSkiver is speaking.

At the 2:06 mark, Kempton is heard asking Plaintiff if he has any personal affects he would like Kempton to retrieve.  Plaintiff responds that he has a backpack in his office, that he will leave his laptop, and that he forgot his cellphone but will drop it off the next day.

Plaintiff then talks about how he used to enjoy working for Defendant but does not anymore.  He mentions that he received a "big raise" previously and that someone had said they never saw anyone get a raise that big.  Plaintiff then says, "I'm glad this happened today, because I'm sick of coming in here and walking on eggshells.  All I want to do is come here and do a good job, get a paycheck, go home.  This job used to be fun.  It hasn't been fun for awhile.  So, I'm glad this happened."  Plaintiff goes on to talk about how much he did for Defendant during his time there.

Kempton then says, "I think you're a spectacular—when you, when you enjoy what you do I think you do . . ."  Plaintiff then cuts in and says "I want to know what comments I said in front of the project manager that weren't appropriate."  In reply, Kempton states, "I know you do, but unfortunately we're not at liberty to discuss that."  Plaintiff then says, "You were there the

whole week with me."  To which Kempton replies, "You are correct I was there."  Plaintiff then asks, "Was it something I said in front of you?"  Kempton replies, "Yes I was there, during, when the comments were made.  I know that we want to hash this out."  Plaintiff then says, "I want to know what I said that was inappropriate."  Kempton replies, "I know you do.  It's human nature to want to know that and I unfortunately am going to be unable to discuss that."  Plaintiff cuts in and says, "You said some inappropriate stuff down there too, but that's besides [sic] the point."

The audio becomes indiscernible once again.  Kempton and VanSkiver are heard asking Plaintiff if he will be able to drive, to which he responds he is fine and that his termination is "a relief."  Plaintiff then tells Kempton and VanSkiver that they had "a pretty good deal going because [he] did the work of two or three engineers for half the price."  Kempton responds by asking Plaintiff if Plaintiff has any personal affects which he needs before departing.  Plaintiff states again that he has a backpack in his office.

The audio becomes indiscernible again as VanSkiver is heard speaking.  VanSkiver and Plaintiff then discuss the possibility of unemployment benefits and what bearing a termination for "inappropriate comments" will have on his ability to receive such benefits.  Plaintiff states at the 5:55 mark, "I'm just going to say you wouldn't give me a reason for termination—what is the reason?"  To which VanSkiver replies, "Inappropriate comments."  Plaintiff then asks, "Inappropriate? What did I say?  Because they're going to want to know that," presumably in reference to what information he will need to provide when seeking unemployment.  Kempton responds, "No, not necessarily."  At the 6:08 mark, Plaintiff says "I'll just say you wouldn't tell me," implying that he would say that Kempton and VanSkiver would not give him a reason for his termination.  To which Kempton replies, "OK, however you need.  I want you to get the benefits.  I hope that New York State decides to give you the benefits.  Corning is not going to decide

whether you get the benefits or not."  Plaintiff says in reply, "I shouldn't have signed that paper a couple weeks ago."  The audio then becomes indiscernible again.  The parties then discuss a "lab book" or something of that nature and whether Plaintiff would like it back.  The last 30 seconds or so of the recording are all background noise and the recording completes at the 7:57 mark.

Plaintiff asserts that Defendant "submitted contradicting termination dates in their own responses during the NYSDHR investigation."  ECF No. 55 at 4.  However, there is nothing in the record that supports this claim.  He also asserts that "[t]he temporal proximity of the termination is an adverse action."  *Id.*  In his April 22, 2021 deposition, Plaintiff testified that he has no firsthand knowledge of when the decision was made to terminate his employment.  ECF No. 52-9 at 57-58.

## DISCUSSION

### I.    Legal Standard

Summary judgment is appropriate when the record shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor.  *See Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).  However, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation."  *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quotation omitted).

II.    **Retaliation under the ADA**

To state a retaliation claim under the ADA, a plaintiff must allege "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn v. City of New York*, 795 F.3d 297, 315-16 (2d Cir. 2015) (internal quotation marks and citation omitted). Defendant argues, *inter alia*, that Plaintiff has failed to establish a causal connection between his alleged protected activity and his termination.[3] ECF No. 52-25 at 20.

The Court previously denied dismissal of this claim because it accepted Plaintiff's argument that the temporal proximity between his June 25, 2017 injury and July 5, 2017 termination was sufficient to satisfy the causation element at the motion to dismiss stage. ECF No. 27 at 5. However, while Plaintiff's allegations were sufficient at that juncture, evidence to support such an argument is now required in response to a motion for summary judgment. *See Ragusa v. Malverne Union Free Sch. Dist.*, 381 F. App'x 85, 89 (2d Cir. 2010) (finding that while temporal proximity between the protected activity and adverse employment action "satisfies the causation element of [plaintiff's] *prima facie* case, it is insufficient to create a question of fact") (summary order).

While Plaintiff asserts that Defendant "submitted contradicting termination dates in their own responses during the NYSDHR investigation," ECF No. 55 at 4, he provides no evidence to support this allegation. Moreover, Plaintiff admitted during his deposition that he has no firsthand knowledge of when the decision was made to terminate his employment. ECF No. 52-9 at 57-58. At summary judgment, Plaintiff "may not rely on conclusory allegations or unsubstantiated

---

[3] The Court need not reach Defendant's additional arguments.

speculation" to support his claims. *F.D.I.C.*, 607 F.3d at 292. The undisputed facts in the record indicate that the decision to terminate was made *prior* to Plaintiff's injury and resulting absence from work. There is nothing in the audio recording of the termination that suggests otherwise.

Furthermore, any argument that Defendant's motive for termination changed or evolved after Plaintiff's injury occurred is unsupported by the record. *See Stephan v. West Irondequoit Central Sch. Dist.*, 769 F. Supp. 2d 104, 109 (W.D.N.Y. 2011) ("Even if plaintiff were to argue that the District's motive for her termination changed after her engagement in protected activity . . . plaintiff has offered no evidence from which a jury could reasonably reach such a conclusion."). Accordingly, Defendant's motion for summary judgment on Plaintiff's ADA retaliation claim is GRANTED and the claim is DISMISSED.

## CONCLUSION

Defendant's motion for summary judgment, ECF No. 52, is GRANTED. Plaintiff's ADA retaliation claim is dismissed, and the Clerk of Court is directed to enter judgment and close this case.

IT IS SO ORDERED.

Dated: March 14, 2022
      Rochester, New York

                                          _____
                                          HON. FRANK P. GERACI, JR.
                                          United States District Judge
                                          Western District of New York